**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BIDI VAPOR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 21 C 1430 |
| VAPERZ LLC, OEM PARTNERS LLC and | ) | |
| VAPERZ ENTERPRISE LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

**CHARLES P. KOCORAS, District Judge**:

The novel question of how the electronic cigarette industry should approach labeling nicotine content in the face of nicotine degradation is both significant and unsettled. This action goes to the heart of that question. Plaintiff Bidi alleges that the Vaperz Defendants' MNGO Stick does not contain the advertised 6% nicotine content, which is a literal falsehood in violation of the Lanham Act. While giving short shrift to apparent industry norms and context, Bidi now moves the Court to issue a sweeping preliminary injunction that could extirpate its competitor's business well before any thorough merits-based determination.

On this record, the Court will simply not step into the U.S. Food and Drug Administration's shoes and issue what amounts to a *de facto* product recall on a preliminary basis. Significantly, the Court finds that Bidi does not credibly establish the

1

threshold requirements for injunctive relief. And, even if it did, the Court would independently deny Bidi's request as inequitable.

First, Bidi implicitly concedes that nicotine degrades with time, so it follows that all e-cigarette products contain different amounts of nicotine than reported. Nicotine degradation thus undermines Bidi's literal falsity theory. It also raises a panoply of unanswered factual questions, which undermine Bidi's belated attempt to pivot to an entirely new ambiguous-but-misleading Lanham Act theory.

Second, because Bidi has not shown some likelihood of success on the merits, it is not entitled to the recently codified statutory presumption of irreparable harm. Even if it were, Vaperz has persuasively rebutted the likelihood and magnitude of Bidi suffering any non-compensable harm.

And third, Bidi's request is fundamentally inequitable. If Bidi is right, it might lose money as this case proceeds to a merits-based adjudication. But, if Vaperz is right and the Court entered Bidi's Proposed Order anyway, the Court would unnecessarily inflict a major blow to Vaperz's business without knowing all the facts. Critically, Bidi also hastily invokes this Court's equitable jurisdiction when the available record evidence demonstrates that Bidi itself may have similar Lanham Act exposure under the very same literal-falsity theory it complains of here.

For these reasons and the others discussed below, the Court denies Bidi's Motion for a Preliminary Injunction. Of course, Bidi can—and may ultimately—prevail at trial.

But, at bottom, Bidi has currently not made the requisite threshold or equitable showings to entitle it to a preliminary injunction. The Court thus denies Bidi's Motion.

## BACKGROUND

The Court takes the following facts from the Complaint and the exhibits attached in support of and in opposition to the Motion for a Preliminary Injunction. At this stage, of course, it is essential for the parties and the public to know that any factual findings are preliminary and do not conclusively resolve the matters disputed by the parties.

Bidi is a developer and marketer of e-cigarettes. Dkt. #1 at ¶ 5. Bidi's primary e-cigarette product is the Bidi Stick, which captures 27.9% of the disposable e-cigarette market in the United States. *Id.* at ¶¶ 6-7. The Vaperz Defendants are wholesale sellers and retailers, but not manufacturers, of a competing e-cigarette known as the MNGO Stick. *Id.* at ¶¶ 14-18.

This lawsuit alleges that Vaperz's MNGO stick, which advertises a 6% nicotine content, does not actually have exactly 6% nicotine. *Id.* at ¶¶ 17-18. To prove this, Bidi retained Labstat International, Inc. and Enthalpy Analytical Inc. to analyze the nicotine content of the MNGO Stick. *Id.* at ¶¶ 19-21. The Labstat report claims that the MNGO stick has an average nicotine level between 3.06% to 3.43%. *Id.* at ¶¶ 22-24. Vaperz's MNGO Stick is sold to consumers for as low as $8.99, while the BIDI stick is often sold for between $12.99 and $15.99. *Id.* at ¶ 26. Given the price discrepancy and the false claim about nicotine content, Bidi alleges that consumers will choose the MNGO

stick instead of the Bidi stick to the detriment of their business and market share. *Id.* at ¶ 29.

Against this factual backdrop, Bidi alleges the following causes of action: (1) false advertising and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); (2) deceptive trade practices in violation of the Illinois Uniform Deceptive Trade Practices act, 815 ILCS § 510, *et seq* (Count II); and (3) deceptive business practices in violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS § 505, *et seq*. (Count III). *Id.* at ¶¶ 32-47.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy [that is] never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Natural Res. Def. Counsel, Inc.*, 555 U.S. 7, 24 (2008)). Rather, as an "equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case *clearly demanding it*." *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018) (cleaned up and emphasis added).

In assessing Bidi's Motion, the Court conducts its analysis in two phases: a threshold phase and a balancing phase. *Id.*

At the threshold phase, Bidi must make three showings. First, that Bidi has "some likelihood" of success on the merits. *Id.* Second, that absent a preliminary injunction Bidi will suffer irreparable harm prior to the final resolution of its claims. *Id.* And third, that traditional legal remedies are inadequate. *Id.*

4

If all three requirements are met, the Court then moves to the balancing phase and "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* (cleaned up). The Court also considers the public interest in denying or granting the injunction. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

Because "a preliminary injunction is an extraordinary and drastic remedy," the Court will not grant the Motion unless Bidi "by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned up). "Mandatory preliminary injunctions – those requiring an affirmative act by the defendant – are [also] ordinarily cautiously viewed and sparingly issued [because] review of a preliminary injunction is even more searching when the injunction is mandatory rather than prohibitory in nature." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020); *see also W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) ("mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds") (cleaned up).

## DISCUSSION

As the record reveals, Bidi has not shown that a preliminary injunction is necessary to preserve the status quo as the case proceeds to trial. First, because Vaperz establishes, and Bidi does not refute, that nicotine degrades over time, the broader

context of the e-cigarette industry weighs against a finding that Bidi has some likelihood of success on the merits. Second, Bidi focuses too much on the recently codified statutory presumption of irreparable harm but ignores that it cannot claim the benefit of that presumption. And, even if it could, Vaperz has more than rebutted the presumption at this stage. And third, even if Bidi met the threshold requirements for injunctive relief, the Court would still independently deny the injunction as inequitable. The Court will address each of these points and make corresponding factual findings in turn.

## 1. Likelihood of Success: Nicotine Degradation Firmly Weakens A Finding That Bidi Has Some Likelihood of Success On The Merits

To receive a preliminary injunction, Bidi must prove some likelihood of success on the merits; a "better than negligible" chance of success is not enough. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Bidi "need not show that it definitely will win the case," but "a mere possibility of success is not enough." *Id.* at 762. Ultimately, Bidi must make a "strong showing," which normally includes a demonstration of how [Bidi] proposes to prove the key elements of its case." *Id.* at 763 (cleaned up). For the following reasons, the Court concludes that Bidi's demonstration is inadequate.

Bidi argues that it is likely to succeed on its Lanham Act deceptive-advertising claim.[1] To prevail under this approach, Bidi must establish that (1) Vaperz made a

---

[1] Bidi also brings claims under Illinois law, which Illinois courts would resolve "according to the principles set forth under the Lanham Act." *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994). The Court thus analyzes them together.

material false statement of fact in a commercial advertisement; (2) the false statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) Bidi has been or is likely to be injured as a result of the false statement. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018). There are two types of actionable false statements: "those that are literally false and those that are literally true [or ambiguous] but misleading." *Id.* at 382; *see also Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999) (discussing "claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers."). "The evidence required to satisfy the first two elements of the claim varies according to the type of statement at issue." *Id.*

Here, Bidi argues that the 6% number Vaperz advertises is actionable under a Lanham Act literal-falsity theory. Later, in its reply brief, Bidi pivots to a second theory that the statement is ambiguous in context, but misleading. The Court addresses each of those contentions in turn and concludes that Bidi has not made a sufficiently strong showing that it has some likelihood of success on the merits under either theory.

**A. Literal Falsity Theory: Vaperz's 6% Claim Is Not Literally False In Context**

Bidi argues that Vaperz's packaging and promotional materials for the MNGO Stick falsely claims that the MNGO stick has 6% nicotine. To prove this, Bidi relies on third-party reports that purport to show that the MNGO Stick has "no more than 4% nicotine." Dkt. #13 at 5. According to Bidi, this alone shows literal falsity for one simple

reason: 4% does not equal 6%. While alluring in its simplicity, the Court finds that this case is much more complicated than 2+2=4.

As the Seventh Circuit has explained, a literally false statement is one that is "*indisputably* false" or "bald-faced, egregious, *undeniable*, [and] over the top." *Schering-Plough Healthcare Prod., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512-13 (7th Cir. 2009) (emphasis added). As that language suggests, the "standard for proving literal falsity is rigorous. Only an *unambiguous* message can be literally false." *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) (cleaned up).

Applying this legal framework, the statement that the MNGO Stick contains 6% nicotine is not *indisputably* or *undeniably* false because both parties agree that nicotine degrades over time. Even though Bidi's reply argues that a +/- 10% degradation is the industry norm, the mere existence of some norm acknowledges the fact that some degradation is inevitable and even expected. The Court thus understands that the amount of nicotine in an e-cigarette product is different at the point of creation versus at the point of sale or consumption. Given this, the MNGO stick could very well have had 6% nicotine at one point in time.

Contextually, nicotine degradation also means that 6% is not a rigid or immutable bright line but is instead a target range that, at a minimum, must encompass more than one number. That roundly undercuts a literal falsity theory because the argument is no longer 4% does not equal 6%; rather, the Court must necessarily consider numbers different than just 6%. As we will learn, this case is likely ultimately about what the

acceptable practice is in the e-cigarette industry and whether the MNGO stick flouts that practice. But the Court cannot decipher how this case could be about literal numeric statements.

Now, to dig in with more granularity, Bidi's Complaint alleges that the MNGO Stick packaging and website are misleading. For example, the MNGO Stick packaging reads in pertinent part "Package Contains: . . . 6.0% Nicotine /ml." Dkt. #1 at 4. That language comes from the MNGO Stick box, a picture of which Bidi replicated in its Complaint as follows:



*Id.* Notably absent from the MNGO Stick Box however is any reference to *when* the package had 6% nicotine. Had the MNGO Stick Box instead read "upon consumption, this product contains 6% nicotine" that statement is much more likely to be literally

false because upon consumption, many sticks would not in-fact contain 6% nicotine at that moment in time. But that is not how Vaperz's advertising reads. Given this, it is altogether plausible that at one point the MNGO stick did at that moment in time have 6% nicotine. Today, the Court need not decide which linguistic interpretation is better because a linguistically competent person could, when considering nicotine degradation, reach at least two conclusions about what 6% means in this context. This inherent ambiguity means that Vaperz's statement is not *indisputably* or *undeniably* false. Rather, this case presents a genuine dispute about market norms in the e-cigarette industry and whether Vaperz has defied those norms.

Even Bidi itself concedes that there is an "industry accepted . . . deviation" from the nicotine content reported on an e-cigarette package. Dkt. #27 at 6. That concession means that Bidi cannot prevail at trial simply by showing that 4% does not equal 6%. That simplistic rule would defy the well-settled principle that an "alleged literal falsehood must be considered in context and with reference to the audience to which the statement is addressed." *Schering-Plough Healthcare Prod., Inc.*, 586 F.3d at 513. It would also likely expose all e-cigarette manufacturers to the charge of literal falsity, which appears absurd given what the parties have told the Court about nicotine degradation.

Of course, as the case proceeds through discovery and to trial, the Court may learn more about the e-cigarette industry and nicotine degradation. But the context of the e-cigarette industry provided by the parties to the Court shows that some deviation

is not only the norm but inevitable given the chemical composition of nicotine. For example, according to Vaperz declarant Dr. Manoj Misra, "nicotine is known to degrade over time." Degradation occurs over time according to Dr. Misra, because of, among other things, exposure to water, heat, or light. The Court is particularly comfortable with accepting this principle because, according to Vaperz's study, even Bidi's own e-cigarette seemingly does not literally have 6% nicotine, including at the point of consumption.

Perhaps recognizing the difficulty of winning on a literal falsity theory, Bidi's reply brief, belatedly and with little support, pivots to the argument that Vaperz's statement is literally false because the MNGO stick contains less nicotine than the industry-accepted +/- 10%. Critically, that pivot alone is a concession that nicotine degrades. *See* Dkt. #27 at 7 (observing that the America E-Liquid Manufacturing Standards Association ("AEMSA") was formed to certify nicotine concentration in e-cigarette products). But Bidi offers truly little substantiation for this industry-wide standard. Indeed, as far as the Court can tell, no uniform industry-wide standard exists. *See Second Declaration of Dr. Manoj Misra*, Dkt. #28-1 at 2 ("I am unaware of an industry standard or FDA requirement relating to an acceptable degradation rate for nicotine in an e-cigarette."). While the AEMSA number is admittedly one possible standard, Bidi has not established how or why the Court should make its prognostications into federal common law before hearing all the available evidence.

If anything, the preceding discussion shows that this case is not a simple math problem; it is a highly technical, nitty-gritty case about acceptable amounts of nicotine degradation in the e-cigarette industry. Of course, Bidi may in the end prevail at trial after discovery has teased out all the particulars. But, at least at this stage, Bidi has not demonstrated an adequate likelihood of success based on its novel and highly malleable theory of literal falsity. Rather, the Court finds it questionable than a literal falsehood theory can prevail where all sides agree that 6% does not mean 6%. Given that, there is nothing unambiguous or indisputable here, which alone weighs against a finding that Bidi has some likelihood of success on its literal falsity theory. *See Schering-Plough Healthcare Prod., Inc.,* 586 F.3d at 512-13; *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002) (*"Because the graphic can reasonably be understood as conveying different messages, Scotts' literal falsity argument must fail."*).

**B. Literally-True-But-Misleading**: **Bidi's Second Theory Is Currently Too Malleable, Undefined, And Speculative To Persuasively Show That Bidi Is Likely To Succeed On The Merits**

Bidi is admittedly comparatively more likely to prevail on a literally-true-but-misleading theory than its literally-false theory. Unfortunately, Bidi's opening briefing (Dkt. #13) relied only on a literal-falsity theory, so its later pivot to this theory is too-little-too-late. *See Darif v. Holder*, 739 F.3d 329, 337 (7th Cir. 2014) ("Darif didn't pivot to an argument under the statutes and regulations until his reply brief. The argument is therefore waived.").

Waiver aside, Bidi has also not substantively shown that this theory has *some* likelihood of success as understood in the Seventh Circuit. *See, e.g., Mays*, 974 F.3d at 818; *Illinois Republican Party*, 973 F.3d at 763. Under the literally-true-but-misleading approach, the thrust of Bidi's argument is that the MNGO Stick contains too little nicotine to be within the range of acceptability in the e-cigarette industry. But, for the reasons discussed below, there is too little information about what is or is not acceptable for Bidi to clearly show that it has some likelihood of success with this approach.

"[W]hen the statement is literally true or ambiguous, the plaintiff must prove that the statement is *misleading in context* by demonstrated actual consumer confusion." *Hot Wax, Inc.*, 191 F.3d at 820 (emphasis added); *see also Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 477 (7th Cir. 2020) ("We stand by the general principle that deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used."). While Bidi must show actual consumer confusion, Bidi is not at this stage required to provide "full-blown consumer surveys." *Eli Lilly*, 893 F.3d at 382 (cleaned up).

Here, Bidi has not shown that the 6% statement is misleading in context. If both sides agree that nicotine degrades, the relevant question becomes the acceptable amount of degradation in this industry. Bidi argues with little support that the industry standard is +/- 10% percent. The problem with that assertion is the Court cannot conclude at this time that there is one industry gold standard for either a degradation baseline or a deviation from that baseline. As Vaperz aptly points out: "How much degradation is

13

allowed? Over what period of time? How much do factors such as temperature and humidity affect degradation?" The Court is extremely interested in the answers to these questions, just as the parties should be interested in them as the case moves forward. But the papers do not supply an adequate answer so that the Court can feel comfortable issuing the sweeping injunction that Bidi seeks.

Without knowing what the baseline amount of acceptable nicotine degradation is, how can Bidi then lodge a claim about what is or is not misleading? The point is that we do not yet know, which means that the Court cannot identify with any conviction what Bidi's actual likelihood of success is on the merits. *See Generac Power Sys., Inc. v. Kohler Co.*, 2012 WL 1287713, at *5 (E.D. Wis. 2012) (denying a request for a preliminary injunction where there was not "any standard industry definition").

In any event, "further proceedings would be necessary to determine whether the statement implicitly conveys a false impression, is misleading in context, or likely to deceive consumers." *Id.* As the case proceeds through the normal litigation process, the contours will no doubt change. For example, Bidi could conduct a nicotine stability study to find the proper rate of degradation. And then the parties could disagree about whether the Bidi Stick and the MNGO Stick meet that proper rate. But, at this time, the Court does not have the benefit of that information, so it will not order drastic and extraordinary preliminary relief on incomplete information.

Bidi's possible rebuttal that anything less than 6% is inherently misleading to consumers ignores that an actionable statement must be misleading *in context. See Hot*

14

*Wax*, 191 F.3d at 820. As discussed above, the context of the e-cigarette industry necessarily includes nicotine degradation. This means that in the context of the overall industry it is not altogether unreasonable for 6% to mean something different than literally and exactly only 6.0000%.

Another barrier to injunctive relief is the robust factual dispute between Bidi and Vaperz about how much nicotine is in the MNGO Stick and the Bidi Stick. At this stage, the Court finds it difficult to reconcile the Shenzhen Alpha Product Testing Co., Ltd report that found that the MNGO Stick has 5.38% nicotine. *See Declaration of Dr. Manoj Misra*, Dkt. #25-2 at 3. Further complicating matters is that Vaperz's expert has declared that this is within the 10% tolerance called for by Bidi. *Id.* at 4.

Even if Bidi could show that the MNGO Stick was false or misleading, Bidi has also not persuasively shown that the alleged 6% misrepresentation is material to potential customer's decisions to buy e-cigarettes. Materiality means that the deception was likely to influence a reasonable consumer's purchasing decision. *Hot Wax*, 191 F.3d at 819. Critically, the focus is on whether the *false statements* caused lost sales. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ("a plaintiff suing under § 1125(a) ordinarily must show that its economic or reputational injury flows directly from the deception wrought by the defendant's advertising")

Here, Bidi has presented little *evidence* that rates of nicotine degradation are "actually salient to consumers"—especially when nicotine degradation appears to be an industry-wide issue. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir.

2020); *see also Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 747 (7th Cir. 2006) (affirming the denial of a preliminary injunction where "there was no evidence to demonstrate a likelihood of success on the merits."); *Alexander v. Chicago Park Dist.*, 709 F.2d 463, 465 (7th Cir. 1983) (affirming denial of preliminary injunction where the "evidence offered by the plaintiffs was not sufficient to establish a reasonable likelihood of success on the merits for their [] claim.").

If anything, the record evidence reflects that "consumers have never complained about MNGO Stick or returned [an] MNGO Stick on the basis of a lack of nicotine potency of MNGO Stick." Dkt. #25-1 at 3. Indeed, as Vaperz incisively points out, it is possible that e-cigarette buyers do not care much about the level of nicotine. On this point, it is not sufficient for Bidi to show "how consumers *could* react; it must show how consumers actually do react." *AstraZeneca v. Tap Pharm.*, 444 F. Supp. 2d 278, 295–96 (D. Del. 2006) (emphasis added). Bidi has not done that. Instead, it is distinctly possible that customers base their purchasing decisions on factors like taste, convenience, or price. Bidi itself points to other features that differentiate the Bidi Stick, including a "high quality aluminum frame and eleven (11) flavors to choose from." Dkt. #13 at 6. Significantly, the record also reflects that the MNGO Stick is usually cheaper than the Bidi Stick, including being sold at up to a 43% discount. *Id.* at 6. Given that fact, it is possible that price alone is determinative, and that price is uncorrelated with actual nicotine. To its credit Bidi attempts to rebut this with, among other things, old and non-U.S.-based studies, but the Court's review of those materials raises more

questions than are answered. The number of uncertainties is ultimately too great for the Court order the wide-ranging remedy that Bidi seeks.

Bidi has also not made a stout showing about causation, meaning *proof* of an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations. *Eli Lilly*, 893 F.3d at 382 (cleaned up). Bidi merely makes the bare assertion that there is a tradeoff in sales and that it is losing market share and profits. But, at this stage, it is just that: an assertion. If anything, the fact that the Bidi Stick also likely has less than 6% nicotine weighs against a causation finding. This is because it is exceedingly difficult, if not impossible, to show tradeoffs between two competitors where both of their products likely contain different amounts of nicotine than advertised, albeit seemingly to different degrees. Vaperz has also persuasively argued that Bidi Stick sales have been increasing by as much as 44% since the previous quarter, which at least at this time weighs against the conclusion that Bidi has some likelihood of success on the merits.

For these reasons, Bidi has made an insufficiently clear showing about its likelihood of success on the merits. That is fatal to Bidi's Motion.

## 2. Irreparable Harm: Bidi Is Not Entitled To The Statutory Presumption Of Irreparable Harm. Even If Bidi Earned That Entitlement, Vaperz Has Largely Rebutted That Presumption

Bidi not only does not establish a likelihood of success on the merits of its claims, but it also does not make a sufficiently "persuasive showing" of irreparable harm. *See Chicago United Indus., Ltd. v. City of Chi.*, 445 F.3d 940, 945 (7th Cir. 2006).

17

Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). For the ensuing reasons, Bidi's irreparable harm showing is insufficiently convincing.

Significantly, Bidi's briefing focuses too much on the presumption of irreparable harm codified at 15 U.S.C. § 1116(a) in December 2020 at the expense of identifying specific harms or why those harms are non-compensable. The new provision provides that Bidi "shall be entitled to a rebuttable presumption of irreparable harm" "upon a finding of likelihood of success on the merits." 15 U.S.C. § 1116(a). But, for the reasons discussed above, the Court does not find that Bidi has a likelihood of success on the merits. Hence, the rebuttable presumption does not apply. *See SFG, Inc. v. Musk*, 2021 WL 972887, at *4 (N.D. Ill. 2021) (declining to apply the new rebuttable presumption because the plaintiff did not demonstrate a likelihood of success on the merits); *Zamfir v. Casperlabs, LLC*, 2021 WL 1164985, at *9 (S.D. Cal. 2021) (same); *Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*, 2021 WL 1372658, at *6 (S.D.N.Y. 2021) (same).

Even were the Court to have made different preliminary findings on Bidi's likelihood of success, Vaperz has still made a strong showing that largely rebuts the presumption. The broader problem with Bidi's arguments is that Bidi relies on "oblique references to the continuing threat of future [lost profits]," "which are insufficient to support a preliminary injunction." *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL

5298527, at *10 (N.D. Ill. 2018). Indeed, as the Supreme Court has held "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Also, lost profits generally "do not constitute irreparable injury, barring exceptional circumstances." *Forest Cty. Potawatomi Cmty. of Wisconsin v. Doyle*, 803 F. Supp. 1526, 1537 (W.D. Wis. 1992) (citing *Downstate Stone Co. v. United States*, 651 F.2d 1234, 1241 (7th Cir.1981)). Bidi's argument is ultimately that the MNGO Stick misrepresentation means more customers pick it when they should pick the Bidi Stick. That tradeoff is not some intangible or amorphous harm; rather, those losses "are purely financial, easily measured, and readily compensated." *Praefke Auto Elec. & Battery Co. v. Tecumseh Prod. Co.*, 255 F.3d 460, 463 (7th Cir. 2001). "There is therefore no showing of irreparable harm" *Id.* To the extent Bidi relies on features like "customer relationships, goodwill, and reputation," which can and usually do constitute irreparable harm, Bidi has merely relied on "bare assertions" that are difficult to sustain. *Motor Werks Partners, L.P. v. BMW of N. Am., Inc.*, 2001 WL 1136145, at *2 (N.D. Ill. 2001).

Bidi has also not provided the Court with enough information about market dynamics to understand how or why Bidi would be irreparably injured. For example, how can Bidi account for the other 6% products on the market, such as the POSH 6% product and the VGOD Stick 6% product? *See Declaration of Peter White*, Dkt. #25-1

19

at 4. And, critically, if nicotine degradation is inevitable, how can there be *irreparable* harm if some degree of misleading communication is inevitable across the entire industry? Thus, while Bidi could theoretically suffer some speculative irreparable injury, the Court has just not seen enough to connect the dots in Bidi's favor.

For these reasons, even if Bidi could make a persuasive showing of its likelihood of success on the merits, which it has not, the Court finds that nearly all of the harms identified could be compensable upon the entrance of a final judgment. That too weighs against Bidi's Motion.

**3. Sliding Scale Balancing: Even Were Bidi To Meet The Threshold Phase, The Balance of Interests Also Weighs Against Bidi's Proposed Injunction**

Even though the Court does not have to balance the harms because Bidi does not meet the jurisdictional prerequisites for an injunction, balancing all of the relevant harms would still provide an independent basis to deny Bidi's proposed injunction.

The Court balances harms on a sliding scale, which is to say that "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side[.]" *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013) (cleaned up). The sliding scale approach "is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc.*, 237 F.3d at 895-96 (cleaned up). Where the chance of success is slight, "the sliding scale requires that the balance of harms weigh heavily

in" Bidi's favor. *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002).

Here, the balance of harms does not weigh heavily in Bidi's favor; rather, the balance weighs firmly against Bidi's proposed injunction.

To begin with, the Court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted[.]" *Scala's Original Beef & Sausage Co., LLC v. Alvarez*, 2009 WL 5183799, at *2 (N.D. Ill. 2009). A preliminary injunction is "not warranted when such extraordinary expense and injury to defendant would result." *Borden, Inc. v. Kraft, Inc.*, 1984 WL 1458, at *18 (N.D. Ill. 1984) (denying a preliminary injunction in part "because the impact upon Kraft would be devastating.").

Here, Bidi's proposed remedy is way too drastic to call for the *preliminary* relief Bidi looks for. Fundamentally, the proposed injunction "would in fact alter the status quo rather than maintain it to prevent harm to the parties." *Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011). It would do that by requiring Vaperz to take a whole panoply of affirmative actions that are likely to change the nature of its business. That is contrary to the ordinary purpose of preliminary injunctions and not supportable because the proposed injunction could have a devastating impact on Vaperz's business by forcing it to alter its entire business strategy before there has been any adjudication on the merits. *See id.*

More precisely, Bidi's Proposed Order submitted to the Court seeks an order that among other things (1) prohibits Vaperz from selling the MNGO Stick with its current

21

packaging; (2) requires Vaperz to tell "all customers and prospective customers" of its "false statements;" (3) requires Vaperz to recall any and all MNGO sticks already sold or distributed; and (4) post the Court's Order on the first page of the MNGO website to apprise potential customers of the false statements. These requests are especially problematic where, with limited opportunity for fact-finding, the Court is being asked to fundamentally jeopardize Vaperz's business. For example, halting Vaperz's production of the MNGO Stick would likely not only affect the Vaperz's bottom line but could jeopardize the livelihoods of the many people it likely employs. Requiring Vaperz to tell its customers about an as-yet-unproven falsehood similarly could permanently diminish its stature in the market. So too could making a public announcement on the first page of its website about an as-yet-unestablished falsehood jeopardize any business goodwill that it has gained. Not to mention that court-ordered recall—at least at this time—would be exceedingly costly and could not be easily undone.

On the record before the Court, those requests are simply a bridge too far. The Court and the parties have been yet unable to benefit from discovery, experts have been unable to testify, and no robust factual findings of any kind have been made. Bidi gives short shrift to this point and is correspondingly too quick to rely on authorities about permanent, not preliminary, relief. For example, *Church & Dwight Company v. SPD Swiss Precision Diagnostics*, concerned the entry of a *permanent*—not a *preliminary*—injunction. 2015 WL 5051769, at *1 (S.D.N.Y. 2015). And, there, to boot, the Court

entered that permanent injunction after an eight-day bench trial. *Id.* Without the benefit of similar fact-finding, the Court cannot and will not enter Bidi's proposed order.

Bidi's request for the Court to order equitable relief is also undermined by the very strong likelihood that the Bidi Stick also does not contain exactly 6% nicotine. Given the parties' robust discussion of nicotine degradation, can Bidi really say with a straight face that each one of its Bidi Sticks has 6%—and, of course, *never* 5.99% or 6.01%—nicotine? The available record evidence suggests that the Bidi Stick could have as low as 5.47% nicotine. *See Dr. Misra Declaration* at ¶¶ 22, 23, and 25; *see also Creekmur Declaration* at ¶¶ 5, 6, and Exhibit B of Creekmur Declaration. Bidi, of course, could disagree with that number. But, if nicotine degradation is right, can Bidi boldly proclaim that no Bidi Stick flunks its own professed theory of Lanham Act literal falsity? Doubtful.

At first blush, this might feel like a legally inconsequential example of the age-old proverb: "those who live in glass houses should not throw stones." That proverb no doubt applies. But, upon closer examination, it is legally significant because throwing stones while in a glass house is directly "relevant to the question of what if any remedy [Bidi] is entitled to. *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985); *see also Philip Morris, Inc. v. Allen Distributors, Inc.*, 48 F. Supp. 2d 844, 856 (S.D. Ind. 1999) ("Unclean hands has been recognized as a defense to a preliminary injunction in a Lanham Act case and may justify denying such an injunctive request."). Because Bidi is trying to invoke equity, it should come to Court with clean hands. *See Stokely-Van*

*Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 532 (S.D.N.Y. 2009). Its failure to do so is yet another equitable factor weighing against Bidi's proposed injunction. *See, e.g., HealthNow v. Catholic Health Sys.*, 2015 WL 5673123, *6 (W.D.N.Y. 2015) (it is "arguably frivolous" to predicate a Lanham Act claim on "the same language [Bidi] uses in its own materials."); *Procter & Gamble v. Ultreo*, 574 F. Supp. 2d 339, 355 (S.D.N.Y. 2008) (applying unclean hands doctrine where plaintiff "has engaged in virtually identical advertising in the past").

The public interest also weighs against the proposed injunction. If Bidi were to prevail, e-cigarette consumers would also be deprived on their e-cigarette of choice, which is contrary to the Court's respect for the "traditional policies of a competitive market" and the idea that the "public substantially benefits from competition." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). On the other hand, the Court also respects consumers' right to not be deceived by false advertisements. But, as discussed above, Bidi has insufficiently demonstrated any form of consumer deception for the Court to believe that this risk is substantial here.

Granting Bidi's proposed injunction also creates potentially undesirable incentives for the e-cigarette industry to the detriment of the public. If companies can be preliminarily enjoined on the basis that their e-cigarettes have *too little* nicotine, rational e-cigarette manufacturers might add more nicotine in the manufacturing process to account for degradation. That incentive structure is contrary to the public's interest as shown by the fact that the U.S. Food and Drug Administration typically

recalls products with too much, but not too little, nicotine. Indeed, because the MNGO Stick does not exceed 6% nicotine, there is an insignificant risk of the user being confused into potentially consuming too much nicotine.

In a similar vein, the public interest also weighs against Bidi's proposed injunction because a court order might disrupt the FDA's processing of the MNGO Stick's Premarket Tobacco Product Application, which is expected to be finalized by the end of September. *See* Dkt. #25-1 at 3. Given this ongoing process, the Court is currently reluctant to step into the shoes of the FDA and effectively issue an FDA-like recall, which could have sizeable unintended consequences for consumers and the industry.

Taken together, the balancing of harms weighs against Bidi's requested injunction. Despite the Court coming out strongly against the injunctive relief sought here, this opinion should not be construed as prejudging the merits of the case at all. Discovery could, and very well might, flush out Bidi's theories and prove false advertising. But, at least for now, Bidi's ask is simply too great. So the Court denies Bidi's Motion.

## **CONCLUSION**

While Bidi may ultimately prevail at trial, Bidi has not by a clear showing carried its burden of persuasion. So, for the preceding reasons, the Court denies Bidi's Motion for a Preliminary Injunction. Telephonic status is set for 8/10/2021 at 10:20 a.m. It is so ordered.

Dated: 6/15/2021

Charles P. Kocoras
United States District Judge